## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JESSE CAMPBELL, III, | |
| Plaintiff, | Civil Action No. |
| v. | 3:19-cv-1512 (CSH) |
| THERESA C. LANTZ, ET AL., | |
| Defendants. | **DECEMBER 12, 2019** |

## INITIAL REVIEW ORDER
## AND RULING ON PLAINTIFF'S
## MOTION FOR APPOINTMENT OF COUNSEL

**HAIGHT, Senior United States District Judge:**

Plaintiff Jesse Campbell, III, is a convicted prisoner currently incarcerated at the Northern

Correctional Institution ("Northern"), a level five, maximum security institution. Northern is run

by the Connecticut State Department of Correction ("DOC"). Plaintiff has filed a civil rights

complaint *pro se* under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act ("ADA"),

42 U.S.C. § 12131, *et seq*., and section 504 of the Rehabilitation Act of 1973 ("Rehabilitation

Act"), 29 U.S.C. § 794(a), against District Administrator Angel Quiros, Commissioner Scott

Semple, Deputy Commissioner Monica Rinaldi, Director Karl Lewis, former Warden William

Mulligan, Dr. Mark Frayne, Dr. Gerard Gayne, Director Craig Burns, Administrator Brian Libel,

former Commissioner Theresa Lantz, former Commissioner Brian Murphy, former Commissioner

Leo Arnone, former Commissioner James Dzurenda, former Warden Wayne Choinski, former

Warden Jeffrey McGill, former Warden Edward Maldonado, former Warden Anne Cournoyer,

former Director Suzanne Ducate, former Administrator Richard Furey, Dr. Heather Gaw, FNU

Pettinger, and former Director Fred Levesque (collectively, the "Defendants"). Doc. 1

("Complaint") ¶¶ 3–24.[1]  Plaintiff alleges that, in their individual and official capacities, Defendants (1) violated his Fourteenth Amendment right to procedural due process; (2) violated his Fourteenth Amendment right to equal protection of the laws; (3) were deliberately indifferent to his medical needs in violation of the Eighth Amendment; (4) subjected him to cruel and unusual punishment in violation of the Eighth Amendment based on the conditions of his confinement; and (5) violated his rights protected by the ADA and Rehabilitation Act.  *Id.* ¶¶ 35–124.  He seeks a declaratory judgment, an injunction, and money damages.  *Id.* at 30 ¶¶ 1–3.  For the following reasons, Plaintiff's Complaint is dismissed in part.

Also pending before the Court is Plaintiff's Motion for Appointment of Counsel, requesting that the Court appoint *pro bono* counsel to represent him.  Doc. 4 ("Motion for Appointment of Counsel").  For the reasons discussed herein, that Motion is denied without prejudice to re-filing.

---

[1]  According to DOC's website, Angel Quiros is currently DOC's North District Administrator and was Northern's warden from 2009 to 2011; Scott Semple was commissioner from 2014 to 2018; Theresa Lantz was Deputy Commissioner from 2001 to 2003 and Commissioner from 2003 to 2009; Brian Murphy was Deputy Commissioner from 2003 to 2009; Leo Arnone was Commissioner from 2010 to 2013; James Dzurenda was Deputy Commissioner from 2010 to 2013 and Commissioner from 2013 to 2014; Monica Rinaldi was Deputy Commissioner from 2014 to 2018; William Mulligan was Northern's warden from 2016 to 2017; Wayne Choinski was warden from 2003 to 2006; Jeffrey McGill was warden from 2006 to 2009; Edward Maldonado was warden from 2011 to 2014; and Anne Cournoyer was warden from 2014 to 2016.  Additional internet research reveals that Karl Lewis at one point served as DOC's Director of Offender Classification & Population Management, as well as its Director of Programs and Treatment; Dr. Craig Burns serves as Chief of Psychiatric Services; Dr. Suzanne Ducate served as Director of Psychiatric Services; Fred Levesque was previously Director of Offender Classification and Population Management; Brian Libel and Richard Furey served as Health Services Administrators; and Drs. Mark Frayne, Gerard Gayne, and Heather Gaw were psychologists employed by DOC.  The Court is unable to ascertain the full name of Defendant Pettinger, who, according to Plaintiff, "is the former psychiatrist for [Northern]. . . . [and] was responsible for the Plaintiff's mental health care and treatment at [Northern]."  Doc. 1 ¶ 23.  The Court anticipates that further fact-finding will reveal the extent to which Defendants are still employed by DOC, if at all; and, if so, in what capacity.

# I. <u>STANDARD OF REVIEW</u>

Under 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint and dismiss any portion that "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b)(1), (2). Although highly detailed allegations are not required, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[2] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than the unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Twombly*, 550 U.S. at 555).

"[W]hether a complaint states a plausible claim for relief will [ultimately] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663–64. When "well-pleaded factual allegations" are present, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. Factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny.

"Although all allegations contained in the complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012)

---

[2] The Second Circuit has consistently adhered to the United States Supreme Court's plausibility standard set forth in *Iqbal*. *See, e.g.*, *Giunta v. Dingman,* 893 F.3d 73, 79 (2d Cir. 2018); *Bd.-Tech Elec. Co. v. Eaton Corp.*, 737 F. App'x 556, 558 (2d Cir. 2018).

(quoting *Iqbal*, 556 U.S. at 678); *see also Amaker v. New York State Dept. of Corr. Servs.*, 435 F. App'x 52, 54 (2d Cir. 2011) (same). Accordingly, the Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted)). Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

With respect to *pro se* litigants, it is well-established that "[*p*]*ro se* submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (*per curiam*)); *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (in reviewing a *pro se* complaint, the court must assume the truth of the allegations, and interpret them liberally to "raise the strongest arguments [they] suggest[]").

Despite being subject to liberal interpretation, a *pro se* plaintiff's complaint still must "state a claim to relief that is plausible on its face." *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). Therefore, even in a *pro se* case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted). Nor may the Court "invent factual allegations" that the plaintiff has not pleaded. *Id.*

## II. <u>FACTUAL ALLEGATIONS</u>

These factual allegations, accepted as true only for the purposes of this Order, are taken from the Complaint and its exhibits.

Plaintiff has a history of documented psychiatric disabilities. In 1995, when a juvenile court assigned Plaintiff to a residential treatment program, Plaintiff was diagnosed with Conduct Disorder. Doc. 1-1, at 10. Additionally, shortly after Plaintiff began serving his term of incarceration in 2000, a DOC mental health screening "resulted in an initial diagnosis of adjustment disorder with depression and anxiety, and borderline personality and antisocial personality disorder." *Id.* In a 2001 evaluation, a DOC psychologist diagnosed Plaintiff with a "psychotic disorder," which was based on Plaintiff's "disorganized thinking and auditory hallucinations," as well as antisocial personality disorder. *Id.* at 10–11. Thereafter, a 2004 report by a Yale University professor and psychologist concluded that Plaintiff has a "schizotypal personality disorder, which makes him vulnerable to brief psychotic episodes and impaired social functioning." *Id.* at 20. Plaintiff has also been diagnosed with dysthymia, or persistent depressive disorder. Doc. 1 ¶ 29.

Plaintiff has been incarcerated since 2000 and an inmate at Northern since 2006. *Id.* at 10 ¶ 36. Northern is a high-security state prison which houses the state's male inmates serving long sentences for violent crimes. Plaintiff was on "death row" at Northern, having been convicted for murder. The Connecticut legislature abolished the death penalty in 2012, however. *See Campbell v. Quiros*, No. 17-cv-946 (CSH), 2018 WL 888723, at *2 n.1 (D. Conn. Feb. 13, 2018) (discussing Connecticut's abolition of the death penalty). Plaintiff's current sentence is for life imprisonment without the possibility of release. *See* Order Amending Initial Review Order, *Campbell v. Quiros*, No. 3:17-cv-946 (CSH) (D. Conn. May 21, 2018), ECF No. 31.

When Plaintiff was transferred to Northern, he received an "automatic placement" on Restrictive Status, and, in particular, on Administrative Segregation Status ("Administrative

Segregation"). *Id.* ¶ 39.[3]  In connection with that classification, Plaintiff was placed in a Restrictive Housing Unit ("RHU"), which Plaintiff refers to as solitary confinement. *Id.* ¶¶ 37–38.[4]  This classification process occurred without "due process," according to Plaintiff. *Id.* ¶ 109.[5]

Plaintiff remains on Administrative Segregation and in the RHU. *Id.* at ¶ 37.  As a result, Plaintiff does not have access to mental health units to treat his psychiatric disabilities. *Id.* ¶ 41. Plaintiff is also unable to participate in other activities that would presumably alleviate some of the symptoms of his disabilities. *Id.* ¶¶ 54–58.[6]  This is the case even though Defendants have known about Plaintiff's disabilities for a considerable amount of time.  For example, early on Defendants were provided with Plaintiff's medical and psychological records which documented his disabilities. *Id.* ¶ 90.  And they received repeated written communications from Plaintiff in which they were informed of his medical conditions. *Id.* ¶¶ 92–93.

---

[3]  Restrictive Status refers to "Administrative Detention, Punitive Segregation, Transfer Detention, Administrative Segregation," among other categories.  *See* State of Connecticut Department of Correction Administrative Directive 9.4 (hereinafter "Directive 9.4") ¶ 3(T). Administrative Segregation status, in turn, refers to the "[p]lacement of an inmate on a restrictive housing status that results in segregation of the inmate whose behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates and that the inmate can no longer be safely managed in general population." *Id.* ¶ 3(B).

[4]  The Restrictive Housing Unit is "[a]n inmate housing unit which is physically separated from other inmate housing where inmates on restrictive housing status, Administrative Detention, or Transfer Detention are placed." *Id.* ¶ 3(S).

[5]  Directive 9.4 requires DOC, for example, to undertake a hearing prior to placing an inmate on Administrative Segregation. *See id.* ¶ 12(A) ("An inmate shall not be placed in Administrative Segregation Status without notice and a hearing.").  The hearing also permits inmates to present witness statements. *See id.* ¶ 12(B) ("The Administrative Segregation Hearing Officer shall examine evidence to support the classification including the inmate's and/or any witness statements.").

[6]  On Administrative Segregation, Plaintiff is not free from restraints, he cannot obtain a job or watch television, has fewer opportunities to play basketball and experiences overall "harsher confinement."  Doc. 1 ¶¶ 54–58.

Nonetheless, Plaintiff has failed to receive proper medical care for his disabilities. For example, Plaintiff experiences headaches, a lack of energy, lethargy, and a lack of concentration. *Id.* ¶ 62. Plaintiff has had "thoughts that are disorganized at times," a "lack of ability to focus," and he has been "emotionally flat[,] delusional, [and he has possessed] false beliefs." *Id.* ¶ 67. His disabilities "cause[] him to withdraw" and he is unable to "sustain his sanity and calmness of mind." *Id.* ¶ 70. Yet, Defendants failed to provide Plaintiff "with adequate mental health care and treatment"—they have "ignored Plaintiff's mental illnesses as punishment for being on death row" and have "intentionally allow[ed] Plaintiff's mental health to worsen and . . . deteriorate." *Id.* ¶¶ 63, 66, 77.

Defendants' failure to sufficiently treat Plaintiff has exacerbated the symptoms of his disabilities. He has suffered from depression, loss of interest and anxiety attacks, heart palpitations. *Id.* ¶ 84–85. He has suffered from "self-mutilation, withdrawal, and obsessive ruminations." *Id.* ¶ 86. And, the conditions of Plaintiff's confinement have substantially limited his ability to participate in major life activities, such as communicating, eating, sleeping, concentrating, and caring for himself. *Id.* ¶ 87.

## III. DISCUSSION

Plaintiff brings a number of claims against Defendants. First, Plaintiff claims that Defendants Lantz, Murphy, Ducate, Levesque, Semple, Mulligan, Burns, Lewis, Rinaldi, and Frayne violated his rights to procedural due process under the Fourteenth Amendment by transferring him to Northern without a hearing. *Id.* ¶¶ 105, 123.[7] Plaintiff also claims that

---

[7] In addition to Plaintiff's Fourteenth Amendment claim for procedural due process, Plaintiff argues that Defendants' actions violated his rights under the Fifth Amendment. However, "Plaintiff's due process claims arise out of the state penal system, so the Court looks at these claims under the Fourteenth Amendment, not the Fifth Amendment." *Johnson v. Maurer*, No. 18-cv-694 (CSH), 2018 WL 6421059, at *14 (D. Conn. Dec. 6, 2018) (citation omitted); *see also Dusenbery*

Defendants Lantz, Murphy, Ducate, Levesque, and Choinski denied him procedural due process because he was transferred to Administrative Segregation without a hearing. *Id.* ¶ 109. Additionally, Plaintiff claims that Defendants Lantz, Murphy, McGill, Choinski, Ducate, Furey, Gaw, and Pettinger violated his procedural due process rights by failing to provide him with a mental health hearing before or after his transfer to Northern. *Id.* ¶ 113. Next, Plaintiff claims that he was denied equal protection of the laws in violation of the Fourteenth Amendment in connection with the transfer. *Id.* ¶ 117. He brings such claims against Lantz, Murphy, Levesque, Ducate, Choinski, and McGill, *id.* at 28 ¶ 120, as well as against Semple, Mulligan, Burns, Lewis, Rinaldi, and Frayne, *id.* ¶ 123; *see also id.* ¶ 117. Plaintiff also argues that all Defendants were deliberately indifferent to his medical needs, based on their failure to provide Plaintiff with adequate mental healthcare, in violation of the Eighth Amendment, *id.* ¶ 98, and that Defendants Lantz, Arnone, Dzurenda, Semple, Murphy, Choinski, McGill, Quiros, Maldonado, Cournoyer, Mulligan, Lewis, Rinaldi, Ducate, and Burns should be held liable for the same based on supervisory liability, *id.* ¶ 101.[8] Plaintiff also claims that the conditions of his confinement—particularly the requirement that he is placed in restraints and is strip searched when he leaves his cell (among other allegations)—constitutes cruel and unusual punishment. *Id.* ¶¶ 54–58, 123.

---

*v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"). Thus, throughout this Order, the Court will analyze Plaintiff's due process and equal protection claims under the Fourteenth, rather than the Fifth Amendment.

[8] Plaintiff also claims that he was subject to "cruel and unusual punishment under . . . [the] Fourteenth Amendment to the United States Constitution by acting with deliberate indifference to Plaintiff's serious mental health needs." Doc. 1 ¶ 99. However, only the Eight Amendment, not the Fourteenth Amendment, proscribes the state from inflicting "cruel and unusual punishments." U.S. Const. amdt. VIII. As such, the Court construes Plaintiff's claim—as well as other, similar claims in his Complaint (*e.g.*, Doc. 1 ¶ 101)—as allegations of Fourteenth Amendment due process violations. The Court addresses these claims below.

Lastly, Plaintiff appears to bring claims under the ADA and Rehabilitation Act based on Defendants' failure to provide him with sufficient mental health care. *Id.* at 30 ¶ 1.

## A.     Official Capacity Claims and Damages

As to individual defendants acting in their *official* capacities, "the eleventh amendment immunity protects state officials sued for damages." *Minotti v. Lensink*, 798 F.2d 607, 609 (2d Cir. 1986) (citing *Kentucky v. Graham*, 473 U.S. 159, 169–70 (1985)); *see also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Quern v. Jordan*, 440 U.S. 332, 342 (1979) (holding that claims for damages against defendants in their official capacities are barred by the Eleventh Amendment). To the extent that Plaintiff seeks damages from state officials in their official capacity, his section 1983 claims are barred by the Eleventh Amendment and will be dismissed.[9]

## B.     Request for Declaratory Judgment and Injunctive Relief

Plaintiff also seeks a declaratory judgment and injunctive relief. Doc. 1, at 30 ¶ 1–2. Declaratory relief operates prospectively "to enable parties to adjudicate disputes before either side suffers great damage." *In re Combustion Equip. Assocs., Inc.*, 838 F.2d 35, 37 (2d Cir. 1988). In particular, "[t]o obtain prospective relief, such as a declaratory judgment or an injunction, a plaintiff must show, *inter alia*, 'a sufficient likelihood that he [or she] will again be wronged in a similar way.'" *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012), *cert. denied*, 568

---

[9] If a section 1983 suit against a state official in his or her *official* capacity seeks *money damages*, the state is deemed to be the real party in interest because an award of damages would be paid from the state treasury. *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48–49 (1994). Under such circumstances, the action is deemed to be against the state so that the state official is entitled to Eleventh Amendment immunity. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

U.S. 1212 (2013) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). "That is, a plaintiff must demonstrate a 'certainly impending' future injury." *Id.* (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

As for injunctions, the Supreme Court held that the Eleventh Amendment does not prohibit the issuance of an injunction. *See Ex Parte Young*, 209 U.S. 123, 160 (1908). Where a plaintiff invokes the doctrine established in *Ex Parte Young*, the suit "is not deemed to be an action against the state. Instead, such an action proceeds against the state officer who, by acting contrary to federal law, acts without authority and therefore, under these circumstances, does not act in a representative capacity." *Lowrance v. Coughlin*, 862 F. Supp. 1090, 1097 (S.D.N.Y. 1994) (footnote omitted).

In this action, Plaintiff brings claims concerning alleged *prior* violations of constitutional law—in particular, Plaintiff's transfer to Northern in 2006, and whether he received due process in connection with his transfer and classification. A request for declaratory judgment with respect to those prior allegations cannot properly be characterized as "prospective," because Plaintiff does not allege how such relief would remedy a future constitutional violation by these defendants. However, Plaintiff also claims that he is experiencing ongoing suffering—that he still lacks access to proper medical care in connection with his psychiatric disabilities. Therefore, some, but not all, of his claims for declaratory relief will be dismissed.

Additionally, the law will not bar *injunctive* relief here as Plaintiff seeks prospective relief. Plaintiff seeks an order from the Court directing Defendants to transfer Plaintiff, Doc. 1, at 30 ¶ 2, presumably to an impatient hospitalization program, *id.* ¶ 45. However, this leaves the question of whether Plaintiff's request for injunctive relief is cognizable, which the Court will address *infra*

in connection with his Fourteenth Amendment procedural due process challenge to Defendants' failure to provide Plaintiff with a mental health hearing.

## C. Procedural Due Process Claims under the Fourteenth Amendment

### 1. Transfer to Northern

Plaintiff first alleges that Defendants violated his right to due process under the Fourteenth Amendment by failing to provide him with a hearing in connection with his transfer to Northern. Doc. 1 ¶¶ 105, 123.

The standard analysis for a procedural due process claim proceeds in two steps. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*). A court first "ask[s] whether there exists a liberty or property interest of which a person has been deprived, and if so . . . whether the procedures followed by the State were constitutionally sufficient." *Id.*

In the prison context, which involves persons whose liberty interests have already been severely restricted because of their confinement in a prison, a prisoner plaintiff cannot show a cognizable deprivation of "liberty" unless he can show that he was subject to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Supreme Court further clarified the principle in *Wilkinson v. Austin*, 545 U.S. 209 (2005): "After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Id.* at 223 (citation omitted). The Second Circuit has also explained that courts must examine the actual punishment received, as well as the conditions and duration of the punishment. *See Davis v. Barrett*, 576 F.3d 129, 133–34 (2d Cir. 2009) (*per curiam*); *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

Assuming a protected interest exists, the Court must consider whether the inmate received process that was constitutionally due, which often depends on context. The procedural protections that are due to a prison inmate facing a disciplinary hearing, for example, are not as expansive as the due process protections for a criminal defendant standing trial. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1973); *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). Of course, protections are still in place for a disciplinary hearing. An inmate must be given "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira*, 380 F.3d at 69 (citing *Wolff*, 418 U.S. at 563–67). Moreover, there must be at least "some evidence to support the findings made in the disciplinary hearing." *See Washington v. Gonyea*, 538 F. App'x 23, 25 (2d Cir. 2013) (citation and internal quotation marks omitted).

Plaintiff argues that he had a protected liberty interest in avoiding transfer to Northern. Doc. 1 ¶ 104. This due process claim must be dismissed. In *Andrews v. Semple*, No. 17-cv-1233 (SRU), 2017 WL 5606740 (D. Conn. Nov. 21, 2017), Judge Underhill dismissed a similar claim, concluding that the plaintiff possessed "a constitutional right to adequate mental health treatment," but he had "no constitutional right to be housed in any particular correctional facility." *Id.* at *4. Judge Underhill also cited to *Olim v. Wakinekona*, 461 U.S. 238, 248 (1983), for the proposition that "inmates have no right to be confined in a particular state or a particular prison within a given state," as well as to *Meachum v. Fano*, 427 U.S. 215, 225 (1976), for the notion that an inmate's "transfer among correctional facilities, without more, does not violate [an] inmate's constitutional rights, even where conditions in one prison are 'more disagreeable' or prison has 'more severe rules.'" *Id.*

The same is true in the instant case. Plaintiff has no constitutional right to be housed in any particular correctional facility. *See id.* Additionally, based on Plaintiff's submissions, it appears that DOC policy does not otherwise prohibit Plaintiff from being housed at Northern. Doc. 1-1, at 63 ("Administrative Directives and CMHC policies do not prohibit people with a mental health score of 2 or 3 from being placed at Northern."). Therefore, Plaintiff's due process claims against Lantz, Murphy, Ducate, and Levesque, Doc. 1 ¶ 105, as well as Semple, Mulligan, Burns, Lewis, Rinaldi, and Frayne, *id.* ¶ 123, based on his transfer to Northern, must be dismissed.

### 2. *Administrative Segregation*

Likewise, Plaintiff claims that his due process rights were violated when he was transferred to Administrative Segregation without a hearing. Plaintiff appears to be arguing that he was not afforded two types of procedures: (1) a general hearing prior to his placement in Administrative Segregation, *id.* ¶ 109; and (2) a mental health hearing prior to his placement in Administrative Segregation, *id.* ¶ 113. The Court will address each, in turn.

Plaintiff claims that when he was first transferred to Northern in 2006, he received an "automatic placement" on Administrative Segregation Status. *Id.* ¶ 39. This classification process occurred "without due process," according to Plaintiff. *Id.* ¶ 50. For purposes of this Order, the Court assumes that when Plaintiff refers to "automatic placement" into Administrative Segregation, he intends to convey that he did not receive notice, a hearing, or the opportunity to present witnesses, in accordance with a DOC directive. *See* Directive 9.4 ¶ 12(A), (B).[10]

---

[10] This interpretation is supported by a number of Plaintiff's grievance appeal forms challenging his classification, in which Plaintiff "request[s] to have due process to be heard . . . and to present witnesses from outside about [his] classification and indefinite placement." Doc. 1-1, at 48. Plaintiff states further that he was "requesting a hearing." *Id.*

This Court considered the question of whether Administrative Segregation in Connecticut raised a protected liberty interest in *Ellerbe v. Jason*, No. 12-cv-580 (MPS), 2015 WL 1064739 (D. Conn. Mar. 11, 2015). In *Ellerbe*, Judge Shea reasoned:

> The Constitution itself does not give an inmate a liberty interest in avoiding more restrictive confinement such as Punitive Segregation or Administrative Segregation. *Wilkinson v. Austin*, 545 U.S. 209, 221–22, 125 S. Ct. 2384 (2005). But state policies regarding conditions of confinement may create a liberty interest in avoiding more restrictive confinement. *Id.* Such an interest may arise if "statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates." *Tellier v. Fields*, 280 F.3d 69, 81 (2d Cir. 2000) (quoting *Welch v. Bartlett*, 196 F.3d 389, 392 (2d Cir. 1999)).

*Ellerbe*, 2015 WL 1064739, at *3.

Judge Shea went on to hold that Directive 9.4—which Plaintiff cites in his Complaint, *see* Doc. 1 ¶ 50—provides "the basis for a liberty interest in avoiding Administrative Segregation," *Ellerbe*, 2015 WL 1064739, at *3. This liberty interest was invoked where the inmate had spent 243 days in administrative segregation as punishment. *See Ellerbe*, 2015 WL 1064739, at *5; *see also Palmer v. Richards*, 364 F.3d 60, 64–65 (2d Cir. 2004) ("Where the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required.").

Based on Plaintiff's assertion that he was immediately placed on Administrative Segregation in 2006 and has since remained under that classification, Plaintiff's Complaint shows that he was committed to Administrative Segregation for more than 101 days.[11] "Such a period of

---

[11] In a letter to Plaintiff dated October 20, 2017, Dr. Frayne explained that Plaintiff is "not an Administrative Segregation inmate." Doc. 1-1, at 55. Rather, Plaintiff is "classified as [a] Death Row Administrative Segregation inmate [which] are programmed differently." *Id.* Based on the very limited record, the Court is unable to discern the difference between these two classifications and therefore the Court's analysis with respect to Plaintiff's placement on Administrative Segregation remains unchanged.

segregated confinement would ordinarily preclude dismissing a claim without fact-finding." *Ellerbe*, 2015 WL 1064739, at *5. Plaintiff may therefore meet the first *Sandin* requirement of a deprivation of a liberty interest imposing an atypical and significant hardship; and, further fact-finding is needed.

In connection with the second requirement, the Court must examine whether the procedures in place were constitutionally sufficient. The purpose of confinement matters greatly. "[N]otwithstanding the label 'Administrative Segregation,' if 'the purpose of more restrictive confinement is disciplinary or punitive,' then the heightened procedural requirements of *Wolff v. McDonnell*, 418 U.S. 539 (1974) apply." *Id.* If such is the purpose, the Supreme Court has opined that inmates "should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566.

Plaintiff believes that his placement on Administrative Segregation Status was punitive. At this stage then, the Court will presume that Plaintiff was entitled to an Administrative Segregation hearing during which *Wolff* procedures were afforded to him. According to Plaintiff, Defendants Lantz, Murphy, Ducate, Levesque, and Choinski "fail[ed] to provide Plaintiff with a hearing[] before or after his . . . placement on Administrative Segregation." Doc. 1 ¶ 109. Absent evidence that affording Plaintiff these procedures was not unduly hazardous to institutional safety or correctional goals, Defendants did not meet the *Wolff* standard. The second step of the *Sandin* test is thus met here. Plaintiff has therefore stated a plausible claim that Defendants Lantz, Murphy, Ducate, Levesque, and Choinski violated his procedural due process rights with respect to his confinement on Administrative Segregation Status.

### *3. Mental Health Hearing*

Plaintiff next claims that his due process rights were violated when he was transferred to Administrative Segregation without providing him with a mental health hearing.  *Id.* ¶ 113. Plaintiff also appears to believe that he would have been transferred out of Northern had he been afforded the mental health hearing; and, that the Court should therefore order such a transfer.  *Id.* at 30 ¶ 2.

Plaintiff claims that he possessed a liberty interest in obtaining a mental health hearing because of a settlement agreement that Connecticut's Office of Protection and Advocacy for Persons with Disabilities entered into with Defendants Choinski and Lantz in 2004.  *Id.* ¶ 113. That agreement states, in relevant part:

> Any prisoner being considered for transfer to [Northern] for placement in the administrative segregation program shall be evaluated by a licensed doctor-level clinician . . . to determine whether the prisoner is seriously mentally ill. . . . If a prisoner housed at [Northern] in the administrative segregation program is found to be seriously mentally ill, that prisoner shall be removed from [Northern] within 10 days of that finding unless exigent circumstances warrant otherwise.

Doc. 1-1, at 180–81.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████[12]

Assuming, however, that Plaintiff is contending that the settlement agreement entitles him to an

---

[12] The preceding sentences, as well as an additional section below, are redacted because they contain references to Plaintiff's medical records.  *See* Doc. 12 ("Electronic Order Granting Plaintiff's Motion to Seal").

*additional* or *different* mental health screening, that argument is not persuasive because the settlement agreement does not establish a constitutional liberty interest.

This Court previously addressed a similar due process argument in connection with the same settlement agreement. Judge Nevas explained that while the settlement agreement established various internal procedural mechanisms, it "confer[ed] no rights on [the plaintiff in the case]" and it did "not create a protected liberty interest in his behalf." *Day v. Lantz*, No. 05-cv-1347 (AHN), 2005 WL 8159872, at *4 (D. Conn. Oct. 24, 2005), *adhered to on reconsideration*, 2006 WL 8439489 (D. Conn. Mar. 24, 2006). Judge Nevas came to that conclusion because the settlement agreement contains a separate provision that states the following:

> This agreement does not confer, and is not intended to confer, any rights upon any other party. The parties to this agreement expressly acknowledge that there shall be no third party beneficiaries to this agreement.

Doc. 1-1, at 178.

Plaintiff's claim in the case at bar similarly fails. "[B]y its terms, the settlement agreement does not create a protected liberty interest." *Day v. Lantz*, 2005 WL 8159872, at *5. Plaintiff's claims against Defendants Lantz, Murphy, McGill, Choinski, Ducate, Furey, Gaw, and Pettinger for violating Plaintiff's Fourteenth Amendment right to procedural due process by failing to provide Plaintiff with a mental health hearing before or after his transfer to Northern are therefore dismissed. Doc. 1 ¶ 113. Nor will the Court order Plaintiff's transfer out of Northern on that basis. *Id.* at 30 ¶ 2.

**D.      Equal Protection Claims under the Fourteenth Amendment**

Plaintiff next appears to bring an equal protection claim based on his transfer to Northern. *Id.* ¶ 117.

The Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "To state a violation of the Equal Protection Clause, a plaintiff must allege 'that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination.'" *Lopez v. Cipolini*, 136 F. Supp. 3d 570, 590–91 (S.D.N.Y. 2015) (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005)); *see also Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977) (stating that where there is an alleged violation of the Equal Protection Clause, "the courts should allow the prison administrators the full latitude of discretion, unless it can be firmly stated that the two groups are so similar that discretion has been abused").

Plaintiff has not asserted or alleged that he is a member of a protected class or that he was mistreated based on some suspect classification by any of the Defendants. *See Green v. Maldonodo*, No. 17-cv-957 (CSH), 2017 WL 3568662, at *5 (D. Conn. Aug. 17, 2017) ("The disabled . . . are not a suspect or quasi-suspect class, and therefore, rational basis scrutiny—that the disparity be rationally related to a legitimate governmental purpose—applies." (citation omitted)).

Thus, the Court assumes that Plaintiff's equal protection claim is based on a "class of one theory." An individual may state an equal protection violation under a "class of one" theory by demonstrating that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 564 (2000). The plaintiff must establish an "extremely high degree of similarity" with the person to whom he is comparing himself, however. *Clubside v. Valentin*, 468 F.3d 144, 159

(2d Cir. 2006) (citation omitted). That is, he must demonstrate the existence of a "comparator"—someone who is "prima facie identical"—who was treated differently. *Silvera v. Connecticut Dep't of Corr.*, 726 F. Supp. 2d 183, 198 (D. Conn. 2010).

Plaintiff claims that he was transferred to Northern "for punitive purposes due to [his] capital offense . . . and not due to his behavior or a reasonably related government objective." Doc. 1 ¶ 117. Plaintiff is therefore alleging that he was treated differently from inmates who had not committed "capital offense[s]." *Id.* Plaintiff has not alleged that he was treated differently than any other *similarly situated* inmate—to the contrary, Plaintiff concedes that he was treated differently because of the type of offense that he committed. *Id.* Without any such allegation, the Court is unable to conclude that Plaintiff has stated a viable equal protection claim. *See, e.g.*, *Johnson v. Maurer*, No. 18-cv-694 (CSH), 2018 WL 6421059, at *14 (D. Conn. Dec. 6, 2018) (dismissing the plaintiff's equal protection claims because the plaintiff had "not alleged that he was intentionally treated differently by Defendants, that he was treated differently than any other similarly situated inmate or that there was not a rational basis for the treatment"); *Green*, 2017 WL 3568662, at *5 (D. Conn. Aug. 17, 2017) (dismissing the plaintiff's equal protection claim because he did "not appear to allege that differential treatment ha[d] been imposed upon him" and because he "fail[ed] to point to anyone similarly situated who received different treatment, and [did] not allege that others suffering from his condition were granted the accommodation"). Any equal protection claims against Defendants based on Plaintiff's transfer are therefore dismissed.[13]

---

[13] Plaintiff also argues that Defendants violated his Eighth Amendment rights by transferring him to Northern and inflicting on Plaintiff cruel and unusual punishment. Doc. 1 ¶ 117. Plaintiff does not appear to be alleging that the physical transfer itself involved cruel and unusual punishment—for example, that he was injured while he was being transported. *Cf., e.g.*, *Davis v. Rinaldi*, No. 19-cv-504 (CSH), Doc. 9, at 22–24 (D. Conn. Oct. 31, 2019) (concluding that the plaintiff stated a claim for an Eighth Amendment violation relating to his transport to and from the RHU to a medical appointment). Rather, Plaintiff alleges that the conditions after

**E.     Cruel and Unusual Punishment under the Eighth Amendment**

*1. Inadequate Mental Health Treatment*

Plaintiff alleges that all of the Defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment.  Doc. 1 ¶ 98.

The Eighth Amendment's prohibition on cruel and unusual punishment protects against deliberate indifference to a prisoner's serious medical needs by prison officials.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To demonstrate deliberate indifference to medical needs, a plaintiff must allege harmful acts or omissions that deny or delay unreasonably access to needed medical care or wantonly cause infliction of unnecessary pain.  *Id.* at 104–06.  Accordingly, not all failures by prison staff to provide medical care rise to the level of a constitutional violation.  *Id.*; *see also Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). "[A] prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability."  *Smith*, 316 F.3d at 184.

The deliberate indifference standard consists of two prongs: (1) the alleged deprivation must be, objectively, "sufficiently serious" to produce death, degeneration, or extreme pain; and (2) subjectively, the defendant must have been aware of a substantial risk that the inmate would suffer serious harm by defendant's act or omission.  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006).

---

Plaintiff's arrival constituted an Eighth Amendment violation.  Plaintiff's claims regarding his conditions of confinement after he arrived at Northern are addressed below.

As to the first prong, "[a] 'serious medical need' exists where, objectively, the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Dotson v. Fischer*, 613 F. App'x 35, 38 (2d Cir. 2015) (quoting *Harrison v. Barkly*, 219 F. 3d 132, 136 (2d Cir. 2000)).

As to the second, subjective prong, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions:

> To establish deliberate indifference, [the plaintiff] must show that [the defendant] harbored the requisite mental state while he denied . . . treatment. He must show that [the defendant] knew of and disregarded an excessive risk to [plaintiff]'s safety; that he not only was aware of facts from which a reasonable person would conclude [plaintiff] faced an excessive risk, but that he personally actually drew that inference.

*Hilton v. Wright*, 673 F.3d 120, 127 (2d Cir. 2012) (*per curiam*). Thus, an allegation of mere negligence is insufficient. Instead, the subjective element requires that an inmate allege that prison officials acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280.

Plaintiff's Complaint and exhibits are contradictory. Although Plaintiff claims that he has received inadequate medical treatment, Plaintiff's submissions also reveal that Plaintiff *has* received certain medical care for his disabilities. Plaintiff states, for example, that he has previously been evaluated by various doctors and mental health workers at Northern, *id.* ¶¶ 34, 61, and that for over sixteen years, he has been working with social workers, *id.* ¶ 64. Plaintiff's prison medical records appear to confirm this: ███████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

■■ Most recently, Plaintiff appears to have—in his own words—participated in a "*regular review*," on April 13, 2017, where his mental health classification was evaluated. *Id*. at 46 (emphasis added).

Plaintiff's records, attached to his Complaint, also appear to indicate that he has had the opportunity to obtain mental health treatment, but has refused to follow the clinical recommendations of DOC's mental health professionals. On October 20, 2017, for example, Dr. Frayne encouraged Plaintiff to "participate in out-of-cell therapy sessions." *Id*. at 55. Further, in a letter dated January 9, 2018, a DOC-affiliated psychiatrist explained that Plaintiff had "repeatedly refused to meet with [his] assigned clinician." *Id.* at 65. The same letter also "strongly encourage[d] [Plaintiff] to work with the mental health clinicians at [his] facility and to participate in custodian programming." *Id.* Contrary to Plaintiff's assertions, therefore, Plaintiff's records indicate that he has had the opportunity to obtain treatment for his disabilities. *See also Walsh v. Coleman*, No. 19-cv-980 (JAM), 2019 WL 3231194, at *7 (D. Conn. July 18, 2019) (dismissing the plaintiff's Eighth Amendment deliberate indifference claim against certain defendants because the plaintiff had, contrary to his contentions, "alleged facts showing that . . . he ha[d] and continue[d] to receive medical care for his mental conditions, including prescription medications, therapy sessions, and self-regulating activities").

On the other hand, accepting Plaintiff's allegations as true and construing them liberally, at this early stage it is also possible to conclude that Plaintiff's access to health care has since been reduced, if he had sufficient access to treatment in the first instance. Plaintiff states that Defendants continue to confine Plaintiff to Northern "supermax solitary confinement which has no mental health units." Doc. 1 ¶ 41. He also states that he has been suffering from headaches, migraines,

lack of energy, lethargy, lack of concentration and he has been "wait[ing] for help." *Id.* ¶ 62. He states that Defendants "failed to provide Plaintiff with adequate mental health . . . diagnosis . . . at [Northern]," they have "failed to develop an adequate treatment plan for the Plaintiff," have "ignored Plaintiff's mental illness," and they have "not provided Plaintiff with any therapy and medications." *Id.* ¶¶ 78, 81–82. Therefore, further fact-finding is needed before the Court can determine the extent to which Plaintiff's allegations regarding his access to health care might present a valid Eighth Amendment claim.

Plaintiff's claims against all Defendants appear to meet the additional requirements of a claim of cruel and unusual punishment. All of the Defendants apparently had advanced knowledge of the substantial risk to Plaintiff associated with his psychiatric disabilities. Specifically, the Defendants were provided with copies of Plaintiff's medical and psychological records. *Id.* ¶ 91. Further, Plaintiff repeatedly informed Defendants about his medical condition through "countless" written requests. *Id.* ¶¶ 92–93. For example, in response to one of Plaintiff's grievances, Dr. Frayne wrote to Plaintiff that he is a "mental health 3 because of your personality disorder, which I have discussed with you." Doc. 1-1, at 55. And, as noted above, various documents associated with Plaintiff's transfer—and health screenings shortly after Plaintiff's arrival at Northern—indicate that Defendants had advanced knowledge.

Thus, Plaintiff's claims against all Defendants for cruel and unusual punishment for lack of adequate mental health treatment cannot be dismissed at this early stage.

### 2. *Supervisory Liability*

Plaintiff also alleges that Defendants Lantz, Arnone, Dzurenda, Semple, Murphy, Choinski, McGill, Quiros, Maldonado, Cournoyer, Mulligan, Lewis, Rinaldi, Ducate, and Burns subjected him to cruel and unusual punishment by creating or permitting to continue a policy or

custom under which Plaintiff was deprived of adequate medical care, and by failing to adequately supervise or train subordinates, in violation of the Eighth Amendment. Doc. 1 ¶ 101.

This Court has previously explained that to the extent a plaintiff seeks damages from defendants "based on their supervisory roles at Northern or in the DOC," a plaintiff must allege facts showing that:

> (1) the official directly participated in the constitutional deprivation; (2) the official learned about the deprivation through a report or appeal and failed to remedy the wrong; (3) the official created or perpetuated a policy or custom under which unconstitutional practices occurred; (4) the official was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the official failed to take action in response to information regarding the unconstitutional conduct.

*Ashby v. Semple*, No. 19-cv-01127 (CSH), 2019 WL 4738742, at *5 (D. Conn. Sept. 26, 2019) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) and *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003)). However, "conclusory, unsupported allegations [of gross negligence or the existence of a policy] are simply insufficient to establish liability of supervisory prison officials under § 1983." *Fowler v. Dep't of Correction*, No. 17-cv-848 (JAM), 2017 WL 3401252, at *9 (D. Conn. Aug. 8, 2017) (dismissing the plaintiff's supervisory liability claim because it was "not supported by specific facts" (citation and internal quotation marks omitted)).

As noted above, Plaintiff claims that Defendants had knowledge of Plaintiff's psychiatric disabilities, and they received "countless" written requests regarding mental health treatment. Doc. 1 ¶¶ 91–93. Plaintiff further claims that Defendants "ignor[ed] . . . Plaintiff's mental disorder." *Id.* ¶¶ 73–74. And, that Defendants "failed to hire sufficient staff to provide adequate evaluation, diagnosis, and treatment to mentally ill prisoners at [Northern]," and "failed to adequately train DOC staff to deal with mentally ill prisoners at [Northern]." *Id.* ¶¶ 79–80. Although Plaintiff's allegations are somewhat conclusory and there is some evidence in Plaintiff's

submissions that his disabilities were not, in fact, ignored, at this time the Court is not prepared to dismiss Plaintiff's supervisory liability claims, as further fact-finding is needed. As such, at this early stage, Plaintiff's claims against Defendants Lantz, Arnone, Dzurenda, Semple, Murphy, Choinski, McGill, Quiros, Maldonado, Cournoyer, Mulligan, Lewis, Rinaldi, Ducate, and Burns for creating or permitting to continue a policy or custom under which Plaintiff was deprived of adequate medical care, can proceed.

### 3. Conditions of Confinement on Administrative Segregation

Plaintiff's Complaint can also be construed to be making a general Eighth Amendment claim regarding the conditions of his confinement on Administrative Segregation. Plaintiff states that Defendants Semple, Mulligan, Burns, Lewis, Rinaldi, and Frayne inflicted on Plaintiff cruel and unusual punishment by placing him in Northern. Doc. 1 ¶ 29. Plaintiff then makes a number of claims regarding Northern's conditions: (1) he is not free from restraints on Administrative Segregation, *id.* ¶ 55; (2) he does not have the opportunity to have a job, watch television, have three contact visits, or play basketball every day, *id.* ¶¶ 56–57; and (3) that he is stripped searched every time he leaves his cell, *id.* ¶ 58. The Court will address each claim.

In connection with Plaintiff's claim regarding his placement in restraints, Plaintiff does not specify whether he is placed in restraints in his cell or when he leaves his cell. *Id.* ¶ 55. For purposes of this Ruling, the Court construes Plaintiff's Complaint to be making a claim that he is subject to an Eighth Amendment violation because he is placed in restraints every time he leaves the cell.[14]

---

[14] This interpretation is supported by one of Plaintiff's communications to Dr. Frayne, in which he requests the "freedom to move around the unit without [an] escort." Doc. 1-1, at 58.

Prisoners have no right to be housed in comfortable surroundings. *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1980) (harsh or restrictive conditions are part of the penalty criminal offenders pay for their crimes). A prisoner's conditions of confinement, however, must meet "minimal civilized measures of life's necessities." *Wilson*, 501 U.S. at 298. This means that prison officials are required to provide for inmates' basic human needs—for example, "food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Cty. Dep't of Social Servs.*, 489 U.S. 189, 200 (1989).

To state an Eighth Amendment conditions of confinement claim, an inmate must establish that a prison official denied him "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citations and quotation marks omitted). The inmate must then show that the official acted with subjective "deliberate indifference to [his] health or safety" because the official knew that the inmate "face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Id.* at 834, 847 (internal citations and quotation marks omitted).

Plaintiff in his Complaint has not alleged that the requirement that he be placed in restraints deprives him of one of life's necessities. Plaintiff makes a single allegation that on Administrative Segregation, "he [is] not free from restraints." Doc. 1 ¶ 55. This single statement does not state a plausible claim that the restraint policy has compromised Plaintiff's health or safety or otherwise deprived him of his basic human needs. *See Branham v. Meachum*, 77 F.3d 626, 631 (2d Cir. 1996) (affirming dismissal of Eighth Amendment claim regarding plaintiff's placement on full restraint status because condition was not unduly harsh and inmate did not assert facts to suggest that prison officials were deliberately indifferent to his health or safety); *Ashby v. Quiros*, No. 17-cv-916 (CSH), 2018 WL 2324081, at *3–5 (D. Conn. May 22, 2018) (collecting cases and

dismissing the plaintiff's Eighth Amendment conditions of confinement claim because his conclusory statements failed to "state a plausible claim that the restraint policy has compromised Plaintiff's health or safety or otherwise deprived him of his basic human need").

Likewise, Plaintiff's other allegations regarding Administrative Segregation—including Plaintiff's inability to have a job, watch television, have contact visits, or play basketball every day—fail, as well. Similar to Plaintiff's restraint policy claim, he has not alleged that these various conditions of his confinement deprive him of one of life's necessities. Similar to above, moreover, Plaintiff's single allegation regarding employment, television, contact visits, and basketball, do not state a plausible claim that the policies have compromised Plaintiff's health or safety or otherwise deprived him of his basic human needs.

With regard to the subjective prong of the Eighth Amendment standard, no facts are alleged to suggest that the restraints imposed by Defendants, or the other conditions of Plaintiff's confinement, constituted a deliberate or intentional disregard of a risk to Plaintiff's health or safety or other basic, human need. Thus, Plaintiff has not alleged facts to meet the subjective prong. Accordingly, any claims related to those conditions are dismissed for failure to state a claim upon which relief may be granted.

Plaintiff also alleges that his Eighth Amendment rights were violated because of Northern's strip search policy. According to Plaintiff, he is "strip searched every time he leaves his cell." Doc. 1 ¶ 58.

"Under certain limited circumstances, the manner in which a search is conducted may give rise to an Eighth Amendment claim." *Green v. Martin*, 224 F. Supp. 3d 154, 168 (D. Conn. 2016) (citations and internal quotation marks omitted). "However courts are generally reluctant to conclude that strip searches—even where an inmate alleges aggressive or inappropriate behavior—

rise to the level of objectively serious enough to constitute an Eighth Amendment violation." *Id.*

A violation would occur, for example, if "[a] correction officer's intentional contact with an

inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken

with the intent to gratify the officer's sexual desire or humiliate the inmate." *Crawford v. Cuomo*,

796 F.3d 252, 257 (2d Cir. 2015). The "principal inquiry" a court must make "is whether the

contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or

by contrast whether it is taken to arouse or gratify the officer or humiliate the inmate." *Id.* at 257–

58. It is clear that "prison officials looking for contraband may subject inmates to reasonable strip

searches and cavity searches," but that such a search "may not be undertaken maliciously or for

the purposes of sexually abusing the inmate." *Id.* at 258; *see also Bell v. Wolfish*, 441 U.S. 520,

560 (1979) (holding that body cavity searches of inmates must be reasonable in scope).

In *Johnson*, 2018 WL 6421059, at *11, I explained the following in connection with prison

strip searches:

> Courts within this Circuit have held that "a strip search without
> elements of sexual harassment, excessive force, or indeed any
> physical contact at all is not sufficiently serious under the objective
> prong to support a claim based on cruel and unusual punishment
> under the Eighth Amendment." *Green*, 224 F. Supp. 3d at 168–69
> (citations and internal quotation marks omitted) (collecting cases).
> Plaintiff includes few details of the strip search itself, but even with
> a "brief instance of alleged sexual touching," it would not be "severe
> enough to constitute a serious deprivation of the plaintiff's basic
> human needs." *Davilla v. Messier*, No. 3:13-cv-81 (SRU), 2014 WL
> 4638854, at *5 (D. Conn. 2014). Without more, the strip search by
> itself does not constitute cruel and unusual punishment.

*Id.*

The case at bar is analogous. Plaintiff's single claim regarding strip searches—which does

not include any allegations of sexual harassment, excessive force, or any physical contact—does

not rise to the level of a cruel and unusual punishment claim under the Eighth Amendment.

Therefore, to the extent Plaintiff makes cruel and unusual punishment claims outside of his deliberate indifference claims against all Defendants, those claims are dismissed.

## F.     ADA and Rehabilitation Act

Plaintiff lastly claims that Defendants violated his rights under the ADA and Rehabilitation Act by failing to provide him with sufficient mental health care.  Doc. 1, at 30 ¶ 1.

"[I]t is well settled that Title II of the ADA does not authorize actions against state officials in their individual capacities."  *Green v. Maldonado*, No. 17-cv-957 (CSH), 2018 WL 2725445, at *7 (D. Conn. June 6, 2018), *reconsideration denied*, 2018 WL 3302590 (D. Conn. July 5, 2018) (citing *Browdy v. Karpe*, 131 Fed. Appx. 751, 753–54 (2d Cir. 2005)); *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) ("[N]either Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials.").  Thus, Plaintiff's ADA and Rehabilitation Act claims against Defendants in their individual capacities are dismissed.

However, "Title II and Rehabilitation Act suits for prospective injunctive relief may, under the doctrine established by *Ex parte Young*, 209 U.S. 123 (1908), proceed against individual officers in their official capacity."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).  Thus, the Court will consider Plaintiff's claims for injunctive relief against Defendants in their official capacities.

To state a prima facie claim for discrimination under the ADA or the Rehabilitation Act, a plaintiff must allege: (1) that he is a "qualified individual" with a disability; (2) that he was excluded from participation in a public entity's services, programs, or activities, or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to

his disability. *Tuttle v. Semple*, No. 17-cv-2037 (JAM), 2018 WL 2088010, at *7 (D. Conn. May 4, 2018) (citing *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)).[15]

In *Tuttle*, this Court dismissed similar ADA and Rehabilitation Act allegations because the plaintiff failed to sufficiently allege the third prong of the statutory claims—namely, that the alleged discrimination was due to disability. *Tuttle*, 2018 WL 2088010, at *7. According to Judge Meyer:

> Plaintiff has not plausibly alleged an exclusion or discrimination claim under either statute, because he has not alleged any facts to suggest that prison officials decided to exclude or discriminate against him *because* of his mental illness. He has alleged that he was placed in segregation at NCI as a result of his transfer due to a disciplinary violation involving a threat to another inmate. There are no facts pleaded to suggest that he was singled out for segregation because of his disabling mental illness, as opposed to his disciplinary violation.

*Id.*

Plaintiff's ADA and Rehabilitation claims in the instant case likewise fail. Although Plaintiff does claim that Defendants "could have housed Plaintiff in less restrictive facilities," Plaintiff has not alleged any facts to suggest that prison officials decided to exclude or discriminate against him *because of* his psychiatric disabilities. Doc. 1 ¶ 39. On the contrary, Plaintiff claims that he was discriminated against and "unlawfully placed . . . on administrative segregation *due to his capital offense.*" *Id.* ¶ 53 (emphasis added). Nor is there any other indication in the Complaint that Defendants' failure to adequately treat Plaintiff was "due to his disability"—as required by the ADA and Rehabilitation Act, *Tuttle*, 2018 WL 2088010, at *7, as opposed to a more general

---

[15] The Second Circuit has previously noted that the standards for a prima facie case under the ADA and Rehabilitation Act are comparable. *See Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) ("Because the standards under [the ADA and Rehabilitation Act] are generally the same and the subtle distinctions between the statutes are not implicated in this case, we treat claims under the two statutes identically." (citation and internal quotation marks omitted)).

"ignoring and playing down" of Plaintiff's diagnoses that are unrelated to his disability, Doc. 1 ¶ 73. Plaintiff's claims under those statutes are therefore dismissed.

## G.        Motion to Appoint Counsel

On September 26, 2019, Plaintiff filed a Motion for Appointment of Counsel requesting that the Court appoint *pro bono* counsel to represent him. Doc. 4.

Pursuant to 28 U.S.C. § 1915(e), the Court may appoint *pro bono* counsel to represent an indigent litigant. *See* 28 U.S.C. § 1915(e)(1); *see also Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986). The decision as to whether to appoint counsel for a *pro se* party is left to the discretion of the Court, which considers criteria including "the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel." *Cooper v. A. Sargenti Co.*, 877 F.2d 170, 172 (2d Cir. 1989).

In *Hodge*, the Second Circuit instructed district courts regarding the applicable standard when exercising discretion regarding appointment of *pro bono* counsel:

> In deciding whether to appoint counsel, . . . the district court should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Hodge*, 802 F.2d at 61–62. With respect to a claim's merits, the Second Circuit advised that the district judge should first determine whether the *pro se* litigant's "position seems likely to be of substance," or shows "some chance of success." *Id.*

In *Cooper*, the Second Circuit later elaborated on its decision in *Hodge*: "In trial courts, the preliminary assessment of likely merit must be undertaken somewhat more generously [than

for appellate courts] since the unrepresented litigant might have difficulty articulating the circumstances that will articulate the merit that might be developed by competent counsel." 877 F.2d at 174. Subsequently, in *Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997), the Court of Appeals drew upon both *Hodge* and *Cooper* to observe that "in some situations a *pro se* litigant may face substantial problems in the very development of a factual record that is needed for resolution of a case that poses complex issues." 114 F.3d at 393.

Under this District's Local Civil Rules, the plaintiff must demonstrate to the presiding judge that: (a) he is unable to afford legal counsel, (2) it is unlikely that counsel may be secured under alternative fee arrangements, and (3) that his claims have "apparent merit." D. Conn. L. Civ. R. 83.10(c)(1). Moreover, under Second Circuit precedent, once the indigent litigant makes a "threshold" demonstration that his "position seems likely to be of substance," the Court "should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination." *Hodge*, 802 F.2d at 61–62; *see also Cooper*, 877 F.2d at 174 ("In trial courts, the preliminary assessment of likely merit must be undertaken somewhat more generously since the unrepresented litigant might have difficulty articulating the circumstances that will indicate the merit that might be developed by competent counsel.").

In the case at bar, Plaintiff appears to have met some, but not all, of the requirements for appointment of counsel. Upon review of Plaintiff's assertions regarding his financial status, the Court is satisfied that he has demonstrated that he is indigent, having been granted leave to proceed *in forma pauperis* and having remained incarcerated since that time. Doc. 11. The Court is

satisfied that he has met his burden with respect to showing he is financially unable to hire his own counsel.

At this early stage of the proceedings, however, the Court cannot determine whether Plaintiff will be able to prove the allegations of his complaint—*i.e.*, whether his claim possesses sufficient merit to warrant the appointment of counsel. Little proof has been presented at this stage of the litigation and there is no additional information in Plaintiff's Motion to Appoint Counsel that would suggest that his case presents a likelihood of success. Doc. 4. Additionally, Plaintiff's remaining claims relate to whether he was placed into Administrative Segregation without a fair hearing and whether he has been receiving adequate mental healthcare. "[T]he issues presented in Plaintiff's case appear discrete and relatively straightforward," and further fact-finding may quickly resolve whether Plaintiff received a proper hearing or has been consistently receiving adequate healthcare. *Steele v. Ayotte*, No. 17-cv-1370 (CSH), 2018 WL 2980326, at *4–5 (D. Conn. June 14, 2018); *see also Parks v. Smith*, 505 Fed. Appx. 42, 43 (2d Cir. 2012) ("[S]econdary factors weighed against the appointment of counsel, since the issues presented in Parks' action were not overly complex and Parks was able to effectively litigate his case without counsel.").

Separate and apart from the merits, Plaintiff's Motion should be denied for the additional reason that he has not made a sufficient showing that he has been unable to obtain representation by, or assistance from, counsel. For Plaintiff to make a sufficient showing here, he would need to contact at least three attorneys and present corroborating proof of these efforts. Courts in this District require that plaintiffs seeking *pro bono counsel* make at least three recent attempts to secure counsel on their own. *See Hunnicutt v. Dinguis*, No. 07-cv-1628 (CSH), 2010 WL 2976195, at *2 (D. Conn. July 26, 2010) ("The standard form Motion for Appointment of Counsel . . .

contains a section entitled 'Efforts to Obtain an Attorney' and advises movants that 'The Court strongly suggests that you contact a minimum of three attorneys.'"); *Walsh v. Buchanan*, No. 11-cv-1206 (SRU) (WIG), 2013 WL 145041, at *3 (D. Conn. Jan. 11, 2013) ("The court concludes that the three documented attempts, including one incomplete attempt to find counsel, are insufficient to demonstrate to the court that plaintiff cannot obtain legal assistance on his own."). In the case at bar, Plaintiff states that he has not yet "spoken with any attorney about handling [his] case." Doc. 4, at 1, 4. Plaintiff does not mention any other efforts to obtain counsel.

In addition, Plaintiff must also indicate whether he has sought assistance from the Inmates' Legal Aid Program ("ILAP"), which provides legal assistance to inmates pursuant to a contract with DOC. Courts in this District have repeatedly required that inmates seek the assistance of ILAP before seeking appointment of *pro bono* counsel.[16] *See, e.g.*, *Swinton v. Wright*, No. 16-cv-659 (SRU), 2016 WL 3579075, at *2 (D. Conn. June 28, 2016) ("Absent a denial of assistance by [ILAP] or a showing that the assistance available is insufficient at this stage of litigation, the plaintiff cannot demonstrate that he is unable to obtain legal assistance on his own."); *Brown v. Dep't of Corr.*, No. 16-cv-376 (MPS), 2017 WL 4679232, at *2–3 (D. Conn. Oct. 18, 2017) (advising plaintiff to contact the "Inmate Legal Aid Program" and denying his motion to appoint counsel without prejudice); *Card v. Coleman*, No. 14-cv-830 (SRU) (WIG), 2014 WL 6884041, at *1 (D. Conn. Dec. 4, 2014) ("In the amended motions for appointment of counsel, the plaintiff fails to indicate whether he has contacted attorneys at the Inmates' Legal Assistance Program since the date the Court denied his prior motion for appointment of counsel. . . . The Court concludes

---

[16] The firm Bansley Anthony Burdo LLC appears to be currently running the Connecticut ILAP. *See* Bansley Anthony Burdo LLC, https://www.bansleylaw.com/ (last visited December 9, 2019). The firm may be contacted by email at info@bansleylaw.com or by phone at (877) 294-7982 (toll free). *Id.*

that the plaintiff has not made sufficient efforts to secure legal assistance or representation on his own."). Plaintiff must prove he has contacted ILAP and failed to receive assistance in order to show that he has been unable to secure representation independently. *See, e.g.*, *Hodge*, 802 F.2d at 61 ("[T]he indigent [must] be unable to obtain counsel before appointment will even be considered."); *Cooper v. A. Sargenti Co.*, 877 F.2d 170, 173 (2d Cir. 1989) (same).

Plaintiff included as attachments to his Complaint two letters from ILAP, one dated March 30, 2015, and another dated February 13, 2016. Doc. 1-1, at 107–09. In both letters, an ILAP attorney asked Plaintiff to provide ILAP with copies of Plaintiff's prison mental health records. *Id.* Plaintiff's records would permit ILAP to "formulate an opinion about whether [Plaintiff] ha[s] a prima facie case which ILAP can offer help." *Id.* at 109. Nonetheless, Plaintiff's submissions in connection with this Motion or his Complaint do not indicate whether Plaintiff followed up with ILAP; or if ILAP ever evaluated, and drew conclusions regarding, the organization's ability to aid Plaintiff. As such, Plaintiff has not made a sufficient showing that he sought ILAP's assistance, or that he otherwise has been unable to obtain representation by, or assistance from, counsel.

Accordingly, following the Second Circuit's instructions in *Hodge* and its progeny, the Court finds that Plaintiff has not met all the requirements for appointment of counsel. The Court is sympathetic that Plaintiff is a *pro se* litigant. However, "there is no constitutional right to appointment of counsel for litigants in civil cases." *Parks*, 505 Fed. Appx. at 43. Unless or until Plaintiff he can establish all circumstances to warrant the appointment of *pro bono* counsel, it is incumbent on the Court to deny his motion for appointment without prejudice.

## IV.    CONCLUSION AND ORDER

Pursuant to 28 U.S.C. § 1915A, the Court has reviewed the *pro se* prisoner's civil Complaint to determine which, if any, claims must be dismissed for failure to state claims upon

which relief may be granted and/or attempts to obtain monetary relief against a defendant who is immune from such relief. Based on the foregoing, the Court sets forth its conclusion and Orders:

(1) Plaintiff's requests for declaratory relief and injunctive relief are DENIED.

(2) All claims against the Defendants in their official capacities are DISMISSED.

(3) The following claims against the individual defendants in their personal capacities for damages are DISMISSED:

A. Procedural due process violations for Plaintiff's transfer to Northern without a hearing;

B. Procedural due process violations against Defendants Lantz, Murphy, McGill, Choinski, Ducate, Furey, Gaw, and Pettinger based on Plaintiff's placement in Administrative Segregation without a mental health hearing;

C. Cruel and unusual punishment claims against Defendants Semple, Mulligan, Burns, Lewis, Rinaldi, and Frayne based on Plaintiff's placement in restraints, strip searches, and other conditions of confinement discussed herein;

D. Failure to accommodate claims under the ADA and Rehabilitation Act.

(4) The following plausible claims against the individual defendants in their personal capacities for damages may proceed:

A. Procedural due process violations against Defendants Lantz, Murphy, Ducate, Levesque, and Choinski for Plaintiff's placement into Administrative Segregation without a fair hearing;

B. Cruel and unusual punishment claims against all Defendants for failing to provide Plaintiff with adequate mental health treatment;

C.     Cruel and unusual punishment claims against Defendants Lantz, Arnone, Dzurenda, Semple, Murphy, Choinski, McGill, Quiros, Maldonado, Cournoyer, Mulligan, Lewis, Rinaldi, Ducate, and Burns for creating or permitting to continue a policy or custom under which Plaintiff was deprived of adequate medical care.

(5)   Plaintiff's Motion for Appointment of Counsel [Doc. 4] is DENIED WITHOUT PREJUDICE.

(6)   The Clerk shall verify the current work addresses for all Defendants with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet containing the Complaint to each Defendant at the confirmed address within **twenty-one (21) days** of this Order, and report to the Court on the status of the waiver requests on the **thirty-fifth (35) day** after mailing.  If any Defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service on him/her by the U.S. Marshals Service, and he/she shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(7)   The Defendants shall file their response to the Complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.  If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above.  They may also include any and all additional defenses permitted by the Federal Rules.

(8)   Discovery, pursuant to Federal Rules of Civil Procedure 26 to 37 shall be completed within **six months (180 days)** from the date of this Order.  Discovery requests need not be filed with the Court.

(9)  All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this Order.

It is SO ORDERED.

Dated:  New Haven, Connecticut
        December 12, 2019

/s/ Charles S. Haight, Jr.
CHARLES S. HAIGHT, JR.
Senior United States District Judge